### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH DAKOTA
### CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:23-CR-30038-RAL** |
| **Plaintiff,** | |
| **vs.** | **REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |
| **JENNIFER WALSH,** | |
| **Defendant.** | |

In this drug conspiracy and possession case, Jennifer Walsh seeks to suppress evidence obtained during searches of a vehicle she drove and her post-arrest statements. She asserts that the arresting trooper impermissibly expanded the traffic stop and that the evidence and statements derived from the stop and vehicle searches should be suppressed. Because the trooper prolonged the stop without reasonable suspicion and the direct and indirect products of the searches are subject to the exclusionary rule, the Court recommends that her suppression motion be granted.

1

## BACKGROUND

On November 24, 2022, Thanksgiving Day, Austin Schmitz, a highway patrol sergeant, stopped a California licensed silver SUV for going four miles-per-hour (mph) over the posted speed limit on Interstate 90, near the Vivian crossover. Walsh, the driver, produced her driver's license as well as the vehicle registration and insurance for it. Schmitz ran Walsh's status, found she had a valid license, had no warrants, and issued her a warning ticket for the speeding violation.

Having completed the mission for the stop, Schmitz transitioned into investigatory mode, asking Walsh when the last time she would have been around anything illegal and requesting consent to search the SUV. He also peppered her with questions about drugs and her criminal history. He tried to get the other occupant of the vehicle, Andrea Pitts, to consent to a search too. Unable to secure consent from the parties, Schmitz told Walsh that he had seen some "inconsistencies," but would not disclose them to her, advised her he was calling for a drug dog, and stepped out of his patrol car and made the call.

In the meantime, Walsh continually asked, and even begged, to go pee (outside, in her urinal, or elsewhere). Schmitz did not respond until Walsh could not hold it any longer and wet her pants.

While waiting for the dog to show up, Schmitz:

1. Ran Walsh's name through two other databases (and did the same for Pitts);

2. Went back to the SUV twice more, leaned his head inside, and looked around;

2

3.  Checked on the VIN for the SUV a second time; and

4.  Spotted a methamphetamine pipe in the passenger door, roughly 50 minutes after handing Walsh the warning ticket, but did not search the vehicle, deciding instead to wait for the dog.

Finally, more than an hour after Schmitz gave Walsh the ticket, her license, and vehicle documents back, the drug dog and its handler arrived. Once deployed, the dog indicated to the odor of illegal substances coming from the SUV. Officers then searched the vehicle on the roadside and a second time at a state shop nearby. In the vehicle, Schmitz and officers found, and seized, methamphetamine (five one-pound packages and a baggie with several grams in it), a pipe and check, papers, cash, and two cellphones.

Walsh and Pitts were arrested on state drug charges and transported to the Brule County Jail. The next day (Friday, November 25), Dylan Dowling, another highway patrolman, and BIA Officer Derek Parish, both drug task force officers, interviewed Walsh at the jail. When pressed about the five pounds of methamphetamine in the SUV, Walsh tearfully and precipitously ended the interview.

That same night, Schmitz received a voicemail from Walsh's significant other that she wished to speak with Dowling and Parish. The following Monday, November 28, the two officers met with Walsh again at the jail.

Afterward, a federal grand jury indicted Walsh and Pitts, charging them with methamphetamine conspiracy and possession offenses. Walsh later moved to suppress the evidence seized from the vehicle and her statements to officers on Fourth Amendment

grounds and under the exclusionary rule.[1] The government opposed the motion.[2] The Court held evidentiary hearings on the motion, took testimony from two witnesses (Schmitz and Dowling) and received six exhibits into evidence.[3]

## DISCUSSION

### I.    Expansion of the Stop

Walsh argues that Schmitz did not have reasonable suspicion to expand the traffic stop.[4] She says that Schmitz had completed his mission about 11 minutes after he initiated the stop and did not have reasonable suspicion of criminal activity until well after the stop's mission was complete.[5] As a result, she maintains, the evidence found in the SUV—over an hour into the stop—became the fruit of an unconstitutional seizure and search and should be suppressed.[6] The government, however, claims that Schmitz was justified in expanding the stop based on his observations and suspicion "of additional criminal activity."[7]

A stop premised only on an observed traffic violation becomes unlawful when drawn out longer than reasonably necessary "to complete the mission" of issuing the

---

[1] Docket Nos. 33, 34.
[2] Docket No. 43.
[3] Docket Nos. 54, 62.
[4] Docket No. 34 at 6-10.
[5] *Id.* at 8-9.
[6] *Id.* at 9-10.
[7] Docket No. 43 at 8-9.

ticket.[8] The mission typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance[.]"[9] Certain inquiries unrelated to the violation are allowed so long as they do not prolong the stop.[10] Once the violation is addressed, or reasonably should have been addressed, the stop and inquiries must terminate.[11] But a stop, may be expanded beyond its original "mission" when officers have reasonable suspicion of other criminal activity afoot.[12] As a result, officers *may* extend a traffic stop for a drug dog to arrive if, during the stop, they develop reasonable suspicion that evidence of a drug crime is concealed in the vehicle.[13] Officers must have their reasonable suspicion before extending the stop and cannot rely on later facts to support the extension.[14]

"Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that

---

[8] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("[T]he tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission.'"); *United States v. Navarette*, 996 F.3d 870, 874 (8th Cir. 2021) (traffic stop may violate the Fourth Amendment "if it lasts longer than necessary to effectuate its mission").

[9] *Rodriguez*, 575 U.S. at 355.

[10] *Id.*

[11] *Id.*

[12] *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) (citing *United States v. Riley*, 684 F.3d 758, 763, 765 (8th Cir. 2012)); *see also United States v. Rutledge*, 61 F.4th 597, 602 (8th Cir. 2023) (officers can prolong traffic stop until drug dog arrives if during stop officers develop reasonable suspicion that evidence of drug crime is concealed in vehicle).

[13] *Rutledge*, 61 F.4th at 602 (citing *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009)).

[14] *United States v. Betts*, 88 F.4th 769, 774 (8th Cir. 2023).

further investigation is warranted.'"[15] Reasonable suspicion allows officers to rely on their specialized training and own experience but requires a totality of the circumstances review from "the standpoint of an objectively reasonable officer."[16]

"If evidence at a traffic stop is 'obtained through a Fourth Amendment violation [it] is normally subject to exclusion.'"[17] This extends to evidence discovered later on that is tainted by, and bears a sufficiently close relationship to, the illegality.[18]

While sitting in the median of Interstate 90, next to the Vivian exit, Schmitz observed an SUV traveling east in excess of the speed limit (84 mph in an 80 mph zone).[19] He then "pulled out onto the Interstate and caught up to the vehicle."[20] Spotting a female behind the wheel,[21] he ran the SUV's license plate to see who the vehicle was registered to.[22] The plate came back to a "Hispanic male from California[.]"[23] Schmitz noticed there was "road grime or salt on the vehicle."[24] The "grime" stuck out from other traffic, in his mind, and was a sign that the SUV came from out of state.[25] Schmitz then stopped the vehicle for the speeding violation.[26]

---

[15] *United States v. Gonzalez-Carmona*, 35 F.4th at 636, 641 (8th Cir. 2022).
[16] *Betts*, 88 F.4th at 774 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).
[17] *Id.* at 773 (quoting *United States v. Forjan*, 66 F.4th 739, 748 (8th Cir. 2023)).
[18] *New York v. Harris*, 495 U.S. 14, 18-19 (1990); *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).
[19] Docket No. 54 at 20-21; Suppr. Hr'g Ex. A at 5.
[20] Docket No. 54 at 23; Suppr. Hr'g Ex. 1 at 00:00:01-00:03:20.
[21] Docket No. 54 at 25.
[22] *Id.* at 23.
[23] *Id.* at 24.
[24] *Id.* at 25.
[25] *Id.*; Suppr. Hr'g Ex. A at 4-5.
[26] Docket No. 54 at 25-26; Suppr. Hr'g Exs. A at 5, and 1 at 00:02:40-00:03:40.

He approached the passenger side of the SUV and saw trash, food wrappers, and clothing in the front of the vehicle, [27] "luggage, blankets, and other items toward[] the rear," [28] and a person sleeping in the backseat. [29] Schmitz testified these were "indicator[s] that [the occupants] may be traveling hard."[30] Elaborating, hard travel could, he said, be linked to drug activity because drug organizations track, and set time lines for, smugglers to avoid detection if the drugs are intercepted enroute to the drop off location.[31]

Schmitz identified Walsh as the driver and, later on, Pitts as the person laying down in the back seat.[32] He discussed with Walsh the reason for the stop and asked for her driver's license, insurance, and the vehicle registration.[33] Walsh provided Schmitz with these documents.[34] Schmitz noticed that Walsh was nervous and had "darty eyes"[35] and requested her to come back and sit in his patrol car.[36] There, he ran her driver's license, did a warrant check,[37] and asked her who owned the SUV.[38] "[A] friend of [Pitts]," Walsh answered, and Pitts "borrowed it."[39] Schmitz then questioned Walsh about the

---

[27] Docket No. 54 at 27; Suppr. Hr'g Ex. A at 6.

[28] Docket No. 54 at 26; Suppr. Hr'g Exs. A at 5-6, and 1 at 00:03:40-00:04:00.

[29] Docket No. 54 at 26.

[30] *Id.* at 27.

[31] *Id.* at 27-28.

[32] *Id.* at 29.

[33] *Id.* at 30.

[34] *Id.*

[35] *Id.* at 30-31; Suppr. Hr'g Ex. A at 6, 9.

[36] Docket No. 54 at 31; Suppr. Hr'g Ex. 1 at 00:04:50-00:05:10.

[37] Docket No. 54 at 31-32.

[38] Suppr. Hr'g Ex. 1 at 00:05:45-00:05:47.

[39] *Id.* at 00:05:36-00:05:55

purpose of her trip.[40] Walsh said that she was traveling with Pitts, her best friend, from California to pick up Pitts's son from her mother's house in Sioux Falls.[41] Walsh also mentioned that she had to be back by Monday (November 28) because her children, who were staying with their father, had school.[42] Schmitz found a trip of such a short duration, without children, to be suspicious.[43]

According to Schmitz, Walsh continued to be overly nervous while seated in his vehicle, surmising that she had an elevated heart rate because her neck arteries were pounding.[44] She had stringy, greasy hair, and decaying teeth, he remarked, indicators of a hard drug user.[45] Eventually, about 11 minutes into the stop, he printed off a warning ticket for the speeding infraction, handed it to Walsh, and gave her license and vehicle information back.[46] Even though the mission for the stop had ended,[47] Schmitz continued to detain Walsh and Pitts because he believed he had reasonable suspicion of criminal activity going on.[48] Roughly six minutes later, Schmitz informed Walsh that based on some "inconsistencies" and because both she and Pitts would not let him search the SUV,

---

[40] Docket No. 54 at 32.
[41] Suppr. Hr'g Ex. 1 at 00:07:00-00:07:30.
[42] *Id.* at 00:07:43-00:08:04; Docket No. 54 at 32-33, 78-79.
[43] Docket No. 54 at 33-34.
[44] *Id.* at 35.
[45] *Id.*; Suppr. Hr'g Ex. A at 8-9.
[46] Docket No. 54 at 36-37; Suppr. Hr'g Ex. 1 at 00:10:40-00:11:33.
[47] Docket No. 54 at 61, 79 (acknowledging stop's mission was concluded at 11 minutes and 32 seconds into stop).
[48] *Id.* at 37-39.

he planned to call a drug dog to sniff the vehicle.[49] The dog, however, did not arrive until almost an hour after that.[50] Meanwhile, Walsh and Pitts waited, while Schmitz investigated and attempted to build a case against them.[51]

Schmitz admitted, and the government does not dispute, that the traffic stop was prolonged at this point.[52] The Court, therefore, need only determine whether Schmitz had reasonable suspicion of criminal activity at the time the stop was extended[53] (when he printed the ticket and returned Walsh's information to her).[54]

This case is similar to, but distinguishable from *United States v. Betts*.[55] There, the Eighth Circuit upheld an expanded stop based on the defendant's "symptoms of drug use," his unusual travel plans, and the officer's observation of a "torch-style lighter."[56] The appeals court also relied on the fact that the officer knew this type of lighter was

---

[49] Suppr. Hr'g Ex. 1 at 00:17:45-00:19:00.

[50] *See id.* at 00:10:30-00:11:35, 01:16:50-01:17:20.

[51] *Id.*; Docket No. 54 at 83.

[52] Docket Nos. 54 at 61 (Schmitz admitted that handing Walsh the warning ticket and driver's license signified "[t]he end of the traffic stop."); *id.* (Q: "So at this point, you had already done everything to successfully complete the mission of your traffic stop, which would have been for the speeding violation, right?" A: "That would have been the conclusion of the warning process, yes."); *id.* at 79 (Q: "11:32 . . . was when you gave Ms. Walsh her driver's license and related papers back. And your mission for the stop — the speeding stop — had ended by then? Is that correct?" A: "Correct. That's when I would have returned all her paperwork."); *id.* (Q: "Why are you [going over to talk with Pitts] if the mission for the stop — the speeding ticket — is already [done]." A: "Everything I had seen up to the point of my traffic stop ending or the warning ending, had raised my suspicion that criminal activity was going on."); 43 at 6-9 (government argues officers had reasonable suspicion to prolong stop).

[53] *Betts*, 88 F.4th at 774.

[54] Suppr Hr'g Ex. 1 at 00:10:30-00:11:35.

[55] 88 F.4th 769 (2-1 decision).

[56] *Id.* at 774-75.

"frequently used to heat methamphetamine and that [the defendant] was on parole for possession and delivery of [methamphetamine]."[57]

Schmitz testified that he extended the traffic stop because he suspected Walsh and Pitts were engaged in criminal (drug) activity based on the following: (1) the cross country travel with a short stay; (2) the grime and salt on the SUV; (3) the excessive luggage in it; (4) Walsh's continued nervousness, quick answers, and diverting of the conversation; and (5) a third party vehicle without knowledge of who the owner was.[58] But in his earlier testimony to a state grand jury, Schmitz acknowledged that he had no proof, and did not even suspect, "there was any illegal drug activity going on" when he first encountered Walsh.[59]

At any rate, whatever concerns Schmitz may have had about "hard travel" should have been dispelled when Walsh told him that she and Pitts stayed in hotels for two nights because of bad weather.[60] The same is true of the "road grime" on the SUV, which is easily attributable to the snowstorm Walsh reported driving through in Wyoming.[61] Traveling in a borrowed vehicle with a bunch of luggage in it, nervous, prompt response behavior, and changing the subject matter of conversation are descriptions applicable to

---

[57] *Id.* at 774.

[58] Docket No. 54 at 79-83.

[59] Suppr. Hr'g Ex. A at 8-9.

[60] Suppr. Hr'g Ex. 1 at 00:05:53-00:06:39 (Walsh tells Schmitz that she and Pitts were supposed to be to Sioux Falls by Thanksgiving (day of stop), but were late because they had to stay overnight in hotels twice because of inclement weather).

[61] *Id.* at 00:06:16-00:06:39.

too many motorists to justify reasonable suspicion.[62] 12 minutes into the stop, Schmitz had nothing specific and revealing (such as impairment, drugs (or odors of them), paraphernalia, or troublesome information from status checks) to tie Walsh and Pitts to any wrongdoing.[63] His innocuous "indicators" did not collectively rise to the level of reasonable suspicion for detention—much less a lengthy one.[64] Walsh's appearance, mannerisms, and long-distance travels in a dirty, lent, cluttered SUV were not a "particularized and objective" basis for suspecting that she and Pitts were engaged in criminal conduct.[65] Stated differently and more succinctly, Schmitz's proffered suspicion for extending the stop "was inchoate rather than reasonable."[66] Because Schmitz lengthened the duration of the traffic stop—without reasonable suspicion—far beyond the time required to complete the stop's mission, Walsh and Pitts were illegally seized in violation of the Fourth Amendment.[67]

---

[62] *See United States v. Leon*, 80 F.4th 1160, 1165-70 (10th Cir. 2023); *United States v. Jones*, 606 F.3d 964, 966-68 (8th Cir. 2010); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (no reasonable suspicion where "circumstances describe a very large category of presumably innocent travelers"); *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003) ("There are limits [] to how far police training and experience can go toward[] finding latent criminality in innocent acts."); *United States v. Crawford*, 891 F.2d 680, 682 (8th Cir. 1989) (reasonable suspicion lacking where defendant's "conduct [was] typical of countless innocent people"); *State v. Wilson*, 430 P.3d 77, 83 (Mont. 2018) (officer's "indicators" amounted to "only a generalized hunch and not an articulation of specific facts demonstrating criminal behavior").

[63] *See United States v. Jones*, 269 F.3d 919, 928-29 (8th Cir. 2001).

[64] *See Leon*, 80 F.4th at 1166-70; *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998); *United States v. Cheng Kong Yang*, 432 F. Supp. 3d 957, 978 (D.N.D. 2020); *Wilson*, 430 P.3d at 82-83.

[65] *See Jones*, 606 F.3d at 967-68; *Jones*, 269 F.3d at 269; *Beck*, 140 F.3d at 1137-39; *Wilson*, 430 P.3d at 83.

[66] *Leon*, 80 F.4th at 1170.

[67] *See Rodriguez*, 575 U.S. at 357.

In making this determination, the Court did not consider Schmitz's observation of the methamphetamine pipe because he did not see the pipe until long after the stop had been expanded.[68] Nor did the Court consider Walsh's statement "We're f**d dude,"[69] because Schmitz did not hear the statement until after Walsh and Pitts were already in jail and he began typing his report and reviewing his vehicle recording.[70]

## II.    Physical Evidence and Statements

The lack of reasonable suspicion to extend the stop does not end the inquiry. The government claims that because the connection between the prolonged stop and Walsh's subsequent statements "is too far removed" or was interrupted by her own intervening conduct, suppression is inappropriate.[71]

Evidence obtained through a violation of the Fourth Amendment has, for more than a century, been excluded from trial.[72] The exclusionary rule is not a remedy prescribed in the Constitution, but a prophylactic measure. It enforces the personal right to be free from unreasonable searches and seizures and to deter Fourth Amendment violations.[73] The rule applies to both "primary evidence obtained as a direct result of an illegal search or seizure" and to later-discovered evidence "found to be derivative of an illegality" or "fruit of the poisonous tree," unless the connection to the underlying

---

[68] Docket No. 54 at 63-64, 85-86.

[69] Suppr. Hr'g Ex. 1 at 00:13:56-00:14:00.

[70] Docket No. 54 at 80.

[71] Docket No. 43 at 9-10.

[72] *Wong Sun*, 371 U.S. at 484-85; *Weeks v. United States*, 232 U.S. 383, 398 (1914).

[73] *See Davis v. United States*, 564 U.S. 229, 236-37 (2011).

illegality is "so attenuated as to dissipate the taint."[74] Verbal statements that stem from a

Fourth Amendment violation "are as much subject to the exclusionary rule as are items

of physical evidence discovered during an illegal search."[75]

"[T]he defendant bears the initial burden of establishing the factual nexus between

the constitutional violation and the challenged evidence."[76] Once he has done so, "the

ultimate burden of persuasion to show the evidence is untainted lies with the

government."[77] The government must demonstrate that the evidence was not "come at

by the exploitation of that illegality [but] instead by means sufficiently distinguishable to

be purged of the primary taint."[78]

"[A] procedural *Miranda* violation differs in significant respects from violations of

the Fourth Amendment, which have traditionally mandated a *broad application* of the

'fruits' doctrine."[79] "While evidence obtained through a Fourth Amendment violation is

normally subject to exclusion, this rule is not absolute."[80] "One such exception to the

general rule of exclusion is the attenuation doctrine, under which '[e]vidence is

admissible when the connection between unconstitutional police conduct and the

---

[74] *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)); *Wong Sun*, 371 U.S. at 487.

[75] *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).

[76] *See id.*

[77] *Id.* (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

[78] *Wong Sun*, 371 U.S. at 488.

[79] *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (emphasis added); *see also United States v. Villalba-Alvarado*, 345 F.3d 1007, 1010 (8th Cir. 2003) (citing *Elstad*, 470 U.S. at 304-07).

[80] *Forjan*, 66 F.4th at 748 (citing *Strieff*, 579 U.S. at 235).

evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.""""[81] "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence[.]"[82]

To determine whether the causal chain between an illegal search and incriminating statements has been broken, *Miranda* warnings—which protect Fifth Amendment rights—are relevant, but three other factors must also be considered. First, the "temporal proximity" between the unconstitutional conduct and the discovery of evidence. Second the "presence of intervening circumstances." Third, and "'particularly' significant," the "purpose and flagrancy of the official misconduct."[83] Evaluating these factors, and giving the last one the most weight, the Court concludes that the government has failed to satisfy its burden of showing that Walsh's statements did not arise from the exploitation of an unlawfully prolonged traffic stop and evidence seized during, and immediately after, the stop.

---

[81] *Id.* (quoting *Strieff*, 579 U.S. at 238).
[82] *Strieff*, 579 U.S. at 238.
[83] *Id.* at 239 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

### A. Primary Evidence

At the outset, the government does not argue that the physical evidence seized from the SUV (the methamphetamine, pipe, cash, notebook, check, and cell phones)[84] is admissible under the attenuation doctrine. And for good reason. Officers obtained the evidence as a direct result of a Fourth Amendment violation.[85] They did not discover the evidence later on—as a derivative of the violation. It is the indirect evidence—Walsh's statements to Dowling and Parish—that the government contends the doctrine applies to and insulates from the jaws of the exclusionary rule. Having decided that the evidence garnered during the stop may not be used at trial, the Court now turns its attention to the statements, or "fruit," of the unlawful search and seizure.

### B. Derivative Evidence and Attenuation

#### 1. Purposefulness and Flagrancy

Starting, in reverse order, with the most important attenuation factor,[86] the Court concludes that Schmitz's conduct was purposeful and flagrant. His decision to detain Walsh and Pitts—for more than an hour after completing the mission for the stop—was

---

[84] *See* Suppr. Hr'g Ex. A at 15-21, 23-24.

[85] *See Segura*, 468 U.S. at 804 ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."); *see also Wong Sun*, 371 U.S. at 485 ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.").

[86] *See United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (stating that purpose and flagrancy is "the most important" attenuation factor "because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.").

a contrived investigatory "fishing expedition,"[87] not some negligent, good-faith mistake he made or a minimally burdensome precaution he took for officer safety.[88]

Indeed, what Schmitz said and did, while on site, and then testified to, have a quality of purposefulness and flagrancy. The following shows Schmitz's calculated plan to investigate and procure evidence against Walsh and Pitts and to arrest them on something:

1. Upon initial contact with Walsh (at the SUV), Schmitz saw nothing that raised his suspicion or was an "indicator" that drug activity was going on.[89]

2. Right after handing the warning ticket, driver's license, and vehicle documents to Walsh, Schmitz informed her that the other part of his job was to look for drugs. Walsh was not free to leave at this point but Schmitz never told her that or advised her that she was being detained. Schmitz then asked when the last time Walsh had been around "anything illegal," if there was anything "illegal" in the SUV, if he could search it, and if Pitts used "coke, heroin, marijuana or anything like that."[90]

3. Getting negative answers, Schmitz asked if Walsh had ever "been in trouble or arrested."[91]

4. About 17 minutes into the traffic stop (roughly 6 minutes after the stop's mission ended), Schmitz informed Walsh that his "main job" was to look for drugs and illegal activity (criminal interdiction).[92]

---

[87] *See and compare Brown*, 422 U.S. at 605 (seizure investigatory and part of expedition for evidence) *with United States v. Lowry*, 935 F.3d 638, 644 (8th Cir. 2019) (record does not suggest officer engaged in fishing expedition).
[88] *See Strieff*, 579 U.S. at 241 (officer "was at most negligent," made "two good-faith mistakes," and conduct thereafter was "negligently burdensome precaution for officer safety").
[89] Suppr. Hr'g Ex. A at 8-9; Docket No. 54 at 37.
[90] Suppr. Hr'g Ex. 1 at 00:11:35-00:12:07; Docket No. 54 at 56-57.
[91] Suppr. Hr'g Ex. 1 at 00:12:11-00:12:17.
[92] *Id.* at 00:17:06-00:17:20.

16

5.  When neither Walsh nor Pitts would consent to a search of the SUV, Schmitz let Walsh know that he was calling for a drug dog and then did so.[93]

6.  Schmitz failed to heed to Walsh's pleas or accommodate her dire need to urinate (even in her own container) until after she already went in her pants, something she had never done before. She also needed to change her tampon. Schmitz was outside his vehicle for part of the time, talking on the phone and checking how far out the drug dog was, but within earshot of Walsh. He could have taken her to a bathroom, only a few miles away, but did not do so.[94]

7.  While waiting for the dog to arrive, Schmitz asked the El Paso Intelligence Center to run Walsh and Pitts's names and then ran a Triple I check on them in California (two checks on both of them).[95]

8.  And as he waited, Schmitz went back to the vehicle (more than once), put his entire head inside it, and looked for evidence from several angles.[96]

9.  50 minutes or so after issuing the written citation, Schmitz checked on the SUV's VIN a second time.[97]

10. As he examined the VIN, Schmitz could see a methamphetamine pipe in the passenger door of the vehicle. Rather than going ahead and searching the SUV, he decided to wait for the drug dog. A search based on the pipe, he said, "may muddy waters or bring more questions into the case." A dog sniff would, he thought, provide "better probable cause."[98]

11. Despite Walsh having a valid driver's license and no warrants, and there being no detectable drug odor coming from the SUV, Schmitz detained Walsh and Pitts at the scene for another 62 minutes, after the mission for the stop was over, until the drug dog arrived and then arrested them once the dog indicated to an odor of narcotics emanating from the vehicle. During this hour-long period, Schmitz continued to investigate Walsh and Pitts and look for incriminating evidence.[99]

---

[93] *Id.* at 00:17:34-00:18:58; Docket No. 54 at 42, 61-62.

[94] Suppr. Hr'g Ex. 1 at 00:16:08-00:16:51, 00:18:59-00:25:10.

[95] *Id.* at 00:31:20-00:50:21; Docket No. 54 at 83.

[96] Suppr. Hr'g Ex. 1 at 00:35:55-00:37:00, 00:55:20-00:58:30.

[97] Docket No. 54 at 63-64.

[98] *Id.* at 91-92.

[99] Suppr. Hr'g Ex. 1 at 00:11:35-01:18:24; Docket No. 54 at 49, 68-70, 79, 86-87.

12. Schmitz searched the SUV twice—once on the side of the roadway and again at a secure indoor location. He had the vehicle towed to that location. The searches yielded methamphetamine, cash, a drug pipe, ledger, check, and two cell phones.[100]

13. In response to questioning at the first evidentiary hearing, Schmitz gave vague and equivocal reasons—multiple times—for extending the traffic stop beyond its mission,[101] some of which Walsh explained and dispelled.[102]

14. At the time of the stop, Schmitz had been a highway patrolman for almost 14 years, and knew that reasonable suspicion was required to prolong a traffic stop.[103]

15. Schmitz acknowledged that his purpose in extending the stop—past its mission—was investigative.[104]

16. He pursued the investigation calling and briefing Dowling, the night of the stop, about the evidence gleaned from it so Dowling could interview Walsh, "expand" on the information they had, and "arrest more people involved in the drug conspiracy."[105] But Schmitz did not want Walsh interviewed that night and directed Dowling to hold off until the next day to meet with her.[106]

Substituting Schmitz and Walsh's names and replacing "arrest" and "probable cause" with "detained" or "detention" and "reasonable suspicion," respectively, the Supreme Court's decision in *Brown v. Illinois* aptly describes Walsh's case:

"[Schmitz detained Walsh] without [reasonable suspicion]. [He] later testified that [the detention was] for the purpose of questioning [Walsh] as

---

[100] Docket Nos. 54 at 47-49, and 62 at 10, 32-34, 39-40; Suppr. Hr'g Ex. A at 17-21.

[101] Docket No. 54 at 26-28, 54-56, 71-73, 79-83.

[102] Suppr. Hr'g Ex. 1 at 00:05:37-00:08:05; *see also* Docket No. 54 at 55-56.

[103] Docket No. 54 at 11, 17, 37-39, 70-72, 79; *see also Brown*, 422 U.S. at 605 n.13 (noting that officers were seasoned detectives, with many years of experience).

[104] Docket No. 54 at 68, 71-72, 83, 86-87; Suppr. Hr'g Ex. A at 9.

[105] Docket Nos. 54 at 49-50, and 62 at 24-41.

[106] Suppr. Hr'g Ex. 3 at 00:07:50-00:08:02.

part of his investigation . . . . The illegality here . . . had a quality of purposefulness. The impropriety of the [detention] was obvious. [A]wareness of that fact was virtually conceded by [Schmitz] when [he] repeatedly acknowledged, in [his] testimony, that the purpose of [his] action was 'for investigation': [Schmitz] embarked upon this expedition for evidence in the hope that something might turn up."[107]

The *Brown* Court held that suppression was warranted—and it is here as well.[108]

### 2. *Miranda* Warnings

Although advised of *Miranda* warnings, Walsh never signed written waivers or otherwise explicitly waived her rights. When asked if she would have a conversation in the November 25 interview, Walsh responded, "I don't know if I do or don't," after twice saying, "I don't know what this is about."[109] Dowling replied, "Okay, well we can start if you'd like and at some point in time you don't want to talk anymore, just let me know."[110] Walsh replied, "Okay" and spoke to Dowling until he announced that he and Parish were not there about "a couple of grams of meth" but to talk to her about "the five pounds [of methamphetamine] found in the vehicle."[111] Hearing this really upset Walsh, causing her

---

[107] *Brown*, 422 U.S. at 592, 605 (internal punctuation altered; footnote, citation, a paragraph break omitted); *see also United States v. Whisenton*, 765 F.3d 938, 942 (8th Cir. 2014) (when analyzing purposeful and flagrant conduct, court considers "whether the violation 'was investigatory in design and purpose and executed in the hope something might turn up.'"); *United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003) (purposeful and flagrant misconduct not limited to situations in which police act in threatening or coercive manner similar to what occurred in *Brown*; court must "examine whether the actions [of police] were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hope [] that it would lead to a confession or useful evidence").

[108] *See Strieff*, 579 U.S. at 257 (Kagan, J., dissenting) (making this same point).

[109] Suppr. Hr'g Ex. 3 at 00:02:25-00:02:35.

[110] *Id.* at 00:02:35-00:02:40.

[111] *Id.* at 00:02:40-00:06:15.

to panic and hyperventilate.[112] When Dowling told her that the five pounds of methamphetamine were "easily ten years federally," she abruptly terminated the interview.[113]

Dowling testified that he read Walsh her rights at the beginning of the November 28 interview and that she "indicated" she understood them, would speak with him, and then did so.[114] This interview though, unlike the earlier one, was not recorded.[115] So there is no record of what exactly the parties said or did during the interview or even how long it lasted.

Walsh's statements were arguably made voluntarily, after an understanding of her *Miranda* rights and an implicit waiver of them.[116] The *Miranda* factor, in the causal connection analysis, leans somewhat in favor of attenuation.[117]

### 3. Temporal Proximity

Dowling and Parish interviewed Walsh at the Brule County Jail on November 25, 17-hours after the traffic stop concluded, and then again on November 28.[118] Only a lapse

---

[112] Docket No. 62 at 29-31; Suppr. Hr'g Ex. A. at 26.

[113] Suppr. Hr'g Ex. 3 at 00:07:25-00:07:45; Docket No. 62 at 29.

[114] Docket No. 62 at 23-26.

[115] *Id.* at 22.

[116] *See Berghuis v. Thompson*, 560 U.S. 370, 382-87 (2010).

[117] *See Riesselman*, 646 F.3d at 1080; *see also United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017) (*Miranda* warnings are a relevant consideration in determining attenuation). *But see Brown*, 422 U.S. at 602-03 (*Miranda* warnings not the "cure-all" for Fourth Amendment violations); 6 Wayne R. LaFave, *Search and Seizure*, § 11.4(c) (6th ed. & Oct. 2022 Update) ("[I]t is crystal clear that giving the defendant the *Miranda* warnings will not break the causal chain between an illegal search and a subsequent confession. . . . The essential fact . . . is that these warnings do not advise him whether the evidence he is confronted with is unlawfully obtained or whether it will be admissible at trial.").

[118] Docket No. 62 at 11, 21-23, 26-27.

of "substantial time" favors attenuation.[119] The short time interval between the unconstitutional seizures and searches and Walsh's first set of statements slants toward suppression.[120] The period between the illegalities and her second statements, on its face, does not.[121] But being confronted with tainted evidence—five pounds of methamphetamine—and told she was "easily" looking at going to prison for ten years was enough to keep any stretched causal chain intact.[122] Anyway, given Dowling's exploitation of that evidence and Walsh's emotional fall out from it, which way temporal proximity tilts is at least debatable.[123]

---

[119] *Strieff*, 579 U.S. at 239; *Kaupp v. Texas*, 538 U.S. 629, 633 (2003) (per curiam).

[120] *See United States v. Shetler*, 665 F.3d 1150, 1159 (9th Cir. 2011) (passage of 36 hours did not weaken causal connection between illegal searches and defendant's statements); *Cox v. State*, 28 A.3d 687, 701 (Md. 2011) (20-hour interval "does not end" attenuation analysis).

[121] *See Wright v. State*, 108 N.E.3d 307, 319 (Ind. 2018) ("weekend passed" between illegal seizure and defendant's incriminating statements and he initiated conversation with law enforcement).

[122] *See Shetler*, 665 F.3d at 1158-59. *But see United States v. Marasco*, 487 F.3d 543, 547-48 (8th Cir. 2007) (no but-for causality where record did not show defendant was confronted with illegally seized evidence).

[123] *See and compare Yorgensen*, 845 F.3d at 914 (more than two days between defendant's arrest and interview weighed in favor of attenuation) *with United States v. Bocharnikov,* 966 F.3d 1000, 1004-05 (9th Cir. 2020) (defendant's statements not sufficiently attenuated from illegal detention and seizure eight months before where agent referred to initial illegality); *see also Shetler*, 665 F.3d at 1159 ("The relevant question for attenuation purposes is whether th[e] passage of time would have in any way dissipated [defendant's] perception that the searches had produced evidence such that his remaining silent would be useless, or decreased the extent to which the government's confronting [him] with the illegally seized evidence induced his statements."); *United States v. Shaw*, 464 F.3d 615, 627-28 (6th Cir. 2006) ("temporal proximity" is an "ambiguous" factor; it "must be considered in light of the conditions and circumstances that occurred during the time frame in question"); *Reed*, 349 F.3d at 464 ("there is no 'bright-line' test for temporal proximity"); *see generally* 6 *Search and Seizure*, § 11.4(b) (mere passage of time ignores possibilities inherent in time lapse and that illegal custody becomes more oppressive as it continues uninterrupted; temporal proximity is therefore "least determinative" attenuation factor).

### 4. Intervening Circumstances

Whether there were intervening circumstances between the Fourth Amendment violations on November 24 and Walsh's November 28 statements is likewise questionable. Unlike the interview of November 25 (which Dowling inaugurated), Walsh initiated the November 28 interview by messaging Schmitz (through her boyfriend) that she wanted to speak with Dowling and Parish again.[124] No disrupting event broke the causal connection between the stop and Walsh's first set of statements. But her request to meet a second time (made the same day as the first interview)[125] seemingly was an interrupting act that severed the connection.[126] Or did it? The presence of a separating occurrence must be considered along with two other issues: (1) whether interrogating officers confronted Walsh with the evidence unlawfully obtained; and (2) whether the answers she gave to them were influenced by her knowledge that they had already seized the evidence.[127]

Dowling and Parish confronted Walsh with the evidence that Schmitz illegally seized.[128] Doing so "tends to induce a confession by demonstrating the futility of remaining silent."[129] There is good reason to believe that the five pounds of

---

[124] Docket No. 62 at 21.
[125] Suppr. Hr'g Ex. A at 25.
[126] *See* 6 *Search and Seizure*, § 11.4(c) (confession after illegal search may not be fruit of search where defendant initiated later police encounter at which confession given).
[127] *See Shetler*, 665 F.3d at 1158.
[128] Docket No. 62 at 18, 34.
[129] 6 *Search and Seizure*, § 11.4(c) (quoting *People v. Robbins*, 369 N.E.2d 577, 581 (Ill. App. Ct. 1977)).

methamphetamine and decade-plus prison term Dowling informed Walsh of induced or influenced her responses to substantive questioning on November 28; the government has not shown otherwise.[130] The role that information played in producing her desire to meet again and make statements was hardly *de minimis*.[131] Being told she was facing substantial prison time for the methamphetamine found in the vehicle she was driving, likely led Walsh to reach out to officers and agree to speak with them.[132] Her November 28 statements cannot be neatly partitioned from the spell of the drug quantity and incarceration revelations Dowling made during the November 25 interview and their effect on her.[133] Even so, Walsh's "reinitiation" still weighs, to some degree, in favor of attenuation.

### 5. End Result

Considered together and based on the circumstances present, the factors militate against attenuation. The purposefulness and flagrancy of Schmitz's conduct—the most meaningful factor—predominates over the others. The purpose of the detention and

---

[130] *See Shetler*, 665 F.3d at 1158; *see also Riesselman*, 646 F.3d at 1079 (no convincing evidence that shows defendant influenced by finding of drugs on his person to make incriminating statements).

[131] *See Riesselman*, 646 F.3d at 1079-80 (officers questioned defendant about other things and not solely about drugs found on his person); *see also Shetler*, 665 F.3d at 1158 n.3 (physical evidence obtained from illegal search did not have a *de minimis* role in bringing about defendant's inculpatory statements).

[132] *See id*. at 1158-59; *see also United States v. Timmann*, 741 F.3d 1170, 1184 (11th Cir. 2013) (when police confronted defendant with evidence they obtained through unlawful search, his "admissions were the direct result of [their] 'exploitation' of the [] search").

[133] *See* Suppr. Hr'g Ex. 3 at 00:06:00-00:08:00 (Walsh becomes hysterical when confronted about the five pounds of methamphetamine and told facing ten years or more of federal time for it); Docket No. 62 at 28-31 (Walsh visibly upset and began to panic and hyperventilate when informed of methamphetamine found in vehicle and that she was looking at ten years "easily" of federal prison for it).

searches were to find evidence that could be used against Walsh and Pitts.[134] The evidence found during the searches was the same evidence Walsh was confronted with and caused her to make incriminating statements.[135] "Because the unbroken 'causal chain' links the initial illegality and [Walsh's] subsequent statement[s], the [statements are] not 'sufficiently an act of free will to purge the primary taint from [Schmitz's] unlawful actions.'"[136] The government did not bear its burden of proving Walsh's statements were not the fruit of a poisonous tree.[137] The statements should therefore be suppressed.[138]

## CONCLUSION

Schmitz unduly prolonged the traffic stop beyond its mission. When he completed the mission for the stop, Schmitz switched into investigatory gear and began to troll for evidence he could use against Walsh and Pitts. He did not have reasonable, particularized suspicion that criminal activity had occurred, or was occurring, when he made the switch to criminal interdiction. Lacking a legal basis for keeping Walsh and Pitts any longer, Schmitz should have let them drive away. But he did not do that, detaining them instead for over an hour more, until a drug dog arrived, and ultimately arresting them on drug charges after the dog indicated to an odor of narcotics in the SUV.

---

[134] *See Shetler*, 665 F.3d at 1160.

[135] *See id.* at 1158-59.

[136] *Brown*, 422 U.S. at 602.

[137] *Id.* at 604 (prosecuting authority failed to sustain its burden of showing evidence in question admissible under *Wong Sun*).

[138] *See United States v. Roubideaux*, No. 3:23-CR-30029-RAL, 2023 WL 5960844, at *5-8 (D.S.D. Aug. 29, 2023), *report and recommendation adopted*, 2023 WL 5957071 (D.S.D. Sept. 13, 2023).

The government did not carry its burden of proving that Walsh's November 25 and 28 statements were sufficiently attenuated from the unlawful detention and seizure of evidence on November 24. Schmitz's purposeful and flagrant conduct, Walsh's emotional state of mind when confronted with illegally seized evidence and then confronted again with the same evidence a few days later, all told, outweigh those factors that favor attenuation. Admittedly, the *Miranda* advisements, the temporal proximity of the November 28 interview, and Walsh's request for that interview all support, at least somewhat, attenuation. But balanced against the purposeful/flagrancy factor, the most "significant" of them all, these factors do not tip the attenuation scale the government's way.

## RECOMMENDATION

For the reasons set forth in this report (including the citations in support of them) and based on the record now before the Court, its

RECOMMENDED that Walsh's motion to suppress,[139] be granted and the government be barred from using, for any purpose at trial, the physical evidence seized during the vehicle searches and the custodial statements she made following her arrest.

---

[139] Docket No. 33.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[140] Unless an extension of time for cause is later obtained,[141] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[142] Objections must "identify[] those issues on which further review is desired[.]"[143]

DATED this 9th day of February, 2024.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[140] *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

[141] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[142] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[143] *Arn*, 474 U.S. at 155.