UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>JENNIFER WALSH,<br>Defendant. | 3:23-CR-30038-RAL<br><br>OPINION AND ORDER DENYING MOTION TO SUPPRESS |

After stopping Defendant Jennifer Walsh for speeding and issuing her a warning, South Dakota Highway Patrol Sergeant Austin Schmitz ("Schmitz") [1] extended the traffic stop to await arrival of a drug detection dog. After the drug dog alerted, he conducted two separate searches of the vehicle, finding seven grams of methamphetamine and then five pounds of methamphetamine concealed behind the car's panels. Walsh moved to suppress evidence obtained from the search and statements she made afterward, arguing the prolonged stop and subsequent automobile search violated the Fourth Amendment's protection against unreasonable searches and seizures. The magistrate judge recommended that Walsh's motion be granted; the United States objected. This Court, after reviewing the record de novo and recognizing fully the competing arguments making this decision a very close call, sustains the United States' objections, Doc. 68, declines to adopt the Report and Recommendation, Doc. 67, and denies Walsh's Motion to Suppress, Doc. 33.

## I. Factual and Procedural Background

[1] Schmitz has been promoted to lieutenant, but his official title at the time of the stop was sergeant.

On Thursday, November 24, 2022, Thanksgiving Day, Schmitz, a trooper for the South Dakota Highway Patrol with nearly 14 years of patrol experience at the time, was parked in the median of Interstate 90 near the Vivian overpass running radar. Doc. 54 at 11, 19–20. The radar clocked a silver SUV traveling eastbound at 84 miles per hour (MPH)—four MPH over the posted speed limit. Id. at 20–21. As the SUV passed by, Schmitz observed that the car had a salty and grimy exterior,[2] which to him suggested that the vehicle had recently traveled from outside the state. Id. at 22; Ex. A at 5. Responding to the traffic violation, Schmitz pulled onto the eastbound lane of Interstate 90 and pursued the speeding SUV, though he did not initially activate his emergency lights. Doc. 54 at 23. Instead, Schmitz pulled alongside the SUV to better observe the vehicle and its driver and run the vehicle's license plate information. Id. at 23–24. The SUV's license plate came back registered to Juan Carlos Campo from southern California, which caught Schmitz's attention given that the driver and lone vehicle occupant he could see was female. Ex. A at 5; see Doc. 54 at 24, 29. After finishing his pre-stop evaluation,[3] Schmitz dropped back behind the vehicle, activated his emergency lights, and conducted the underlying traffic stop. Doc. 54 at 25–26. The SUV pulled over near mile marker 217. See Ex. 1.

As Schmitz approached the SUV on the passenger side, he observed a second occupant, later identified as Andrea Pitts, laying down or sleeping in the back seat amid blankets with luggage and other items. Doc. 54 at 26. Schmitz noticed that the front passenger compartment

---

[2] The dash camera video (dashcam) of the traffic stop does not show the vehicle's exterior to be particularly salty or grimy, though it shows Interstate 90 and the surrounding landscape to be devoid of any snow or wetness and shows the day to be clear. Walsh's SUV was not overtly dirty but appeared to have more road grime than other vehicles in central South Dakota that day, judging from the dashcam and Schmitz's testimony. Doc. 54 at 25.

[3] At the suppression hearing, Schmitz testified about how this pre-stop assessment allows him to evaluate possible risk factors he may encounter when performing a traffic stop, such as a stolen vehicle report. Id. at 24.

was full of miscellaneous trash, food items, and clothing, which to Schmitz signified "hard travel."[4] Id. at 26–27. Through the passenger side window, he talked with Walsh, the driver of the SUV, informing her of the reason for the stop and requesting her license, registration, and proof of insurance. Walsh provided all without incident. Id. at 29–30. Schmitz neither saw nor smelled drugs at the time, but he observed that Walsh appeared overly nervous for a routine traffic stop, with shaking hands and "darty eyes." Id. at 30, 38, 53. Schmitz then asked Walsh to accompany him back to his patrol car. Id. at 31.

In the patrol car,[5] Schmitz ran a license and warrant check on Walsh using his computer. Id. at 32, 36, 87. Meanwhile, Schmitz began questioning Walsh about the details of her trip. Id. at 31; Ex. 1 at 00:05:37. Walsh explained that she and Pitts were traveling from "the Bay area" of California to Sioux Falls to visit Pitts' mother and to pick up Pitts's son, who had been staying with Pitts's mother. Ex. 1 at 00:05:37–00:07:16; see Doc. 54 at 32–33. Walsh added that they had to be back to California before Monday because her kid or kids,[6] who stayed home with their father, had school. Doc. 54 at 33; Ex. 1 at 00:07:45. Schmitz found Walsh's story suspicious for two reasons: first, given the length of travel involved, the stay seemed uncommonly short for a planned holiday trip, Doc. 54 at 33; second, Walsh was traveling without her family on Thanksgiving, id. Walsh described being caught in bad weather in Wyoming and having to spend

---

[4] Schmitz's suppression hearing testimony described "hard travel" as a practice common among drug traffickers, which involves driving long distances with as few stops as possible to reduce the chance of interacting with law enforcement. See Doc. 54 at 27. Signs of hard travel include a car that looks "lived in." See id.

[5] The dashcam captured the conversation within the patrol car; Schmitz did not wear a body camera, so testimony about what Schmitz saw, said, and heard while at the vehicle comes from his testimony at the suppression hearing.

[6] Walsh's statement "my kid's got to go to school" leaves it unclear if she meant "my kids (plural) got to go to school" or "my kid's (singular) got to go to school." The dialogue captured by the dashcam left it unclear whether Walsh lives with the kid's or kids' father or if there was shared custody or visitation.

two nights in hotels, however. Ex. 1 at 00:06:03–00:06:31. Schmitz asked Walsh about who owned the car, but Walsh did not say; she simply replied that Pitts borrowed it from a friend. Id. at 00:05:45–00:05:50.

According to Schmitz, Walsh remained overly nervous, spoke rapidly, and exhibited such a visibly elevated heart rate that Schmitz could see Walsh's carotid artery pulsate in her neck. Doc. 54 at 34–35. Walsh's physical appearance also stood out to Schmitz. He described her as having "stringy" and "greasy" hair[7] and unusually worn, decaying teeth, consistent with heavy drug use. Id. at 35. Schmitz decided to issue Walsh a warning for traveling 84 MPH in an 80 MPH zone but testified, "I believe I had reasonable suspicion that criminal activity was going on" when he issued the warning. Id. at 37–39.

About 11 minutes into the stop, Schmitz printed the warning ticket and handed it to Walsh along with her driver's license, insurance, and registration. Id. at 60–61. But he did not tell Walsh that she was free to go. Id. at 36–37. Instead, he advised her that the other part of his job involved looking for illegal drugs and contraband. Ex. 1 at 00:11:33. He then asked Walsh when she was last around anything illegal and whether she had illegal drugs in the vehicle. Id. at 00:11:35–00:11:52. Walsh responded that she was last in trouble 20 years ago and that there were no drugs in the car. Id. at 00:11:56. Schmitz then asked Walsh for consent to search the vehicle to "make sure there's nothing illegal." Id. at 00:11:56. Walsh did not consent, telling Schmitz that he would "have to talk to [Pitts]" because she was the one who borrowed the car. Doc. 54 at 39; Ex. 1 at 00:12:00.

[7] The dashcam video shows that Walsh wore her hair up in a somewhat messy bun, but the video is not of a sufficient quality to determine the stringiness or greasiness of her hair, or the condition of her teeth. Ex. 1 at 00:04:55–00:05:03.

Schmitz then exited his patrol car to talk with Pitts. Doc. 54 at 39. As Schmitz reapproached the SUV, he observed Pitts laying down again either attempting or pretending to sleep. Id. at 40. At the suppression hearing, Schmitz explained how passengers will feign sleeping when they do not want to interact with law enforcement. Id. While talking to Pitts, Schmitz asked about the owner of the vehicle, but Pitts could not provide the owner's name, stating instead that "[the name is] on that paper back there," presumably referring to the vehicle's registration. Id. at 39. When asked whether she would consent to a search of the SUV, Pitts too declined. Id. at 41.

Schmitz returned to his patrol car and informed Walsh that he planned to call a drug detection dog because he had observed things he interpreted as suspicious, though he did not expand on what those observations were. Ex. 1 at 00:17:22–00:17:34. The closest drug dog unit was Bureau of Indian Affairs Officer Christopher Moran ("Moran"), who was stationed in Lower Brule, about 39 miles from the traffic stop. Doc. 54 at 41–43. Moran's vehicle broke down en route to the traffic stop, and he had to call the Lyman County Sheriff to drive him and his canine the rest of the way. Doc. 54 at 43.

The report and recommendation concluded that Schmitz's conduct on site had "a quality of purposefulness and flagrancy" as a part of a "calculated plan to investigate and procure evidence against Walsh and Pitts and to arrest them on something." Doc. 67 at 16. One of the various reasons listed for that conclusion was:

> Schmitz failed to heed to Walsh's pleas or accommodate her dire need to urinate (even in her own container) until after she already went in her pants, something she had never done before. She also needed to change her tampon. Schmitz was outside his vehicle for part of the time, talking on the phone and checking how far out the drug dog was, but within earshot of Walsh. He could have taken her to a bathroom, only a few miles away, but did not do so.

Id. at 17; see also id. at 2. The dashcam audio first captures Walsh mentioning her need to urinate when Schmitz was not within earshot but was outside his patrol car asking Pitts for permission to

search the vehicle. Ex. 1 at 00:16:21. When Schmitz returned to the vehicle, Walsh asked him if it was "against the law to pee outside here," to which Schmitz responded, "not really but kinda." Id. at 00:16:36–00:16:41. Schmitz then informed Walsh about his intention to call a drug dog because "I'm just kind of seeing some things I don't like." Id. at 00:17:34–00:18:21. Schmitz left the patrol car to do so, during which Walsh is heard again on the dashcam video repeatedly saying that she had to "pee, pee, pee." Id. at 00:18:59. Upon Schmitz returning to the patrol car, Walsh reiterated that she needs to pee and has a portable urinal in her car. Id. at 00:20:43–00:21:33. Schmitz responded, "Okay. Let me see if I can get someone to run you up to the gas station up here." Id. at 00:21:36. Walsh about seven seconds later said that she peed her pants and has to change her tampon. Id. at 00:21:43–00:21:46. Schmitz then let Walsh rejoin Pitts in the SUV and use their portable urinal, and Walsh was out of the patrol car within seven minutes of when she first asked Schmitz if it was legal to pee outside. Id. at 00:16:36 (Walsh's first mention to Schmitz of needing to pee), 00:22:45 (Walsh leaving patrol car). Schmitz kept a respectful distance during the approximately six minutes while Walsh was back in the SUV. Id. at 00:23:00–00:29:00. Walsh was wearing grey sweats, did not change out of the grey sweats, and no wetness of her pants is visible on the dashcam video as she walks to her SUV to use the portable urinal or back from her SUV to the patrol car. Id. at 00:22:45–00:23:00.

While awaiting Moran's arrival, Schmitz continued to investigate his suspicions. Doc. 54 at 83, 86. He conducted a Triple–I background check on both Walsh and Pitts and ran their information through the El Paso Intelligence Center (EPIC). Id. at 83, 86. Schmitz also reapproached the SUV to verify that the Vehicle Identification Number (VIN) on the car matched the VIN recorded on the vehicle's registration. Id. at 45. While looking into the car for the first time from the driver's side window, Schmitz observed in the front passenger door cup holder what

he believed to be a "bubbler," a bong used to smoke methamphetamine, although he was not "100 percent sure" because he "couldn't quite clearly see it enough." Id.; Ex. A at 15. He later saw that it was in fact a methamphetamine bong when, shortly before Moran arrived, he had Pitts and Walsh open the front passenger door to roll up the windows in preparation for the dog sniff. Doc. 54 at 46. Schmitz chose not to rely on the bong's presence as cause to search the SUV because the drug dog was close by then, he did not want to "muddy the waters," and the dog sniff would provide "better probable cause." Id. at 91–92.

Moran and his dog arrived on scene about one hour and seventeen minutes into the traffic stop—almost an hour and five minutes after Schmitz handed Walsh the warning. Id. at 66. Moran's dog indicated to the presence of drug odor emanating from within the vehicle. Id. at 47. Schmitz and Moran searched the vehicle and discovered a small baggie containing seven grams of methamphetamine within Walsh's purse. Id. at 47–48; Ex. 4 at 12. While searching the rear of the vehicle, Schmitz noticed what he described as "tool markings," or irregular markings consistent with the repeated removal of a vehicle's interior panels. Doc. 54 at 48. The officers transported the vehicle from the roadside to a state auto shop for a more thorough search. Ex. A at 17. This second search revealed five pounds of methamphetamine behind the "back passenger side quarter panel." Doc. 54 at 48. The packages of methamphetamine were covered in axle grease, a technique used for masking scent. Id. at 48–49. The search also revealed a pipe, checks, two cellphones, a drug ledger, and $1,179 in cash. Ex. A at 20–21.

Both Pitts and Walsh were arrested on state drug charges and transported to the Brule County Jail. Doc. 62 at 10. The next day, Trooper Dylan Dowling ("Dowling"), an investigator with the FBI Northern Plains Safe Trails Drug Task Force, and BIA Officer Derek Parish ("Parish") interviewed Walsh at the jail. Id. After confirming some biographical information,

Dowling read Walsh her Miranda rights and elaborated on her right to end the interview at any point:

> One of the things [the warnings] don't talk about is like we can have a conversation here today . . . if there is something that you don't want to talk about, you just say "hey I don't want to answer that." If at any point in time you just want to end the conversation just let us know, we will get you back to your cell[.]

Ex. 4 at 4. About midway through the interview, Dowling told Walsh, "I'm not gonna beat around the bush on this, we don't come out for a simple little meth --- couple of grams." Id. at 11. He proceeded to ask what she knew about the five pounds of methamphetamine. Id. at 12. Walsh responded that she "[had] no clue" and admitted to having only seven grams in her purse. Id. Dowling added that "this is easily 10 years federally." Ex. 4 at 14. Walsh then ended the interview. Id. at 15.

Later that evening, Schmitz forwarded Dowling a voicemail he had received from Walsh's significant other. Doc. 62 at 21. The voicemail advised that Walsh would like to speak again with Dowling and Parish, and a few days later, Dowling and Parish returned to the Brule County Jail to interview Walsh a second time. Id. Dowling once again advised Walsh of her Miranda rights before the interview and Walsh proceeded to make statements. Id. at 23.

In March 2023, a federal grand jury indicted Pitts and Walsh for conspiracy to distribute a controlled substance and possession with intent to distribute a controlled substance. Doc. 1. Walsh filed the present motion to suppress to exclude evidence seized from the SUV and her subsequent statements. Doc. 33. The magistrate judge held two evidentiary hearings on Walsh's motion and issued a report and recommendation, Doc. 67, recommending that Walsh's motion be granted in its entirety. The United States objected to several of the magistrate judge's findings and conclusions. Doc. 68.

## II. Standard of Review

When a party objects to a magistrate judge's report and recommendation, a district court judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

## III. Discussion

Neither party disputes the validity of the traffic stop. Walsh's speeding violation provided Schmitz with probable cause that a traffic violation had occurred. See United States v. Rederick, 65 F.4th 961, 965 (8th Cir. 2023) (stating that a traffic stop is reasonable at its inception if the officer making the stop had probable cause that a traffic violation occurred). The parties also agree that the mission of the traffic stop—addressing the speeding violation—concluded when Schmitz handed Walsh the warning citation along with her license, insurance, and registration. United States v. Navarette, 996 F.3d 870, 874 (8th Cir. 2021) (stating that a traffic stop, although valid at its inception, "may nonetheless violate the Fourth Amendment if it lasts longer than necessary to effectuate" the mission of the stop); Rodriguez v. United States, 575 U.S. 348, 354 (2015) (explaining that the mission of a traffic stop is "to address the traffic violation that warranted the stop, and attend to related safety concerns" (internal citations omitted)). Thus, the issue here is whether Schmitz had "articulable, reasonable suspicion" that the defendants were engaged in unlawful activity to justify extending the traffic stop to await a drug detection dog.

The report and recommendation determined that Schmitz's suspicions were "inchoate rather than reasonable" and lacked something "specific and revealing (such as impairment, drugs (or odors of them), paraphernalia, or troublesome information from status checks) to tie Walsh and

Pitts to any wrongdoing." Doc. 67 at 11. Objecting to the report and recommendation, the United States asserts that Schmitz, informed by his training and experience, developed reasonable suspicion that criminal activity was afoot, and in fact Schmitz testified about what prompted him to believe he had reasonable suspicion to prolong the stop. If the report and recommendation had concluded that Schmitz's testimony was not credible, this Court likely would adopt the recommendation to grant the motion to suppress. The dashcam video and audio corroborates parts of Schmitz's testimony, though does not show images of the SUV's interior or close enough images of Walsh to corroborate all of Schmitz's testimony. This Court is left in the awkward position of choosing between whether to credit the instincts of a 14-year highway patrol veteran[8] or adopt the recommendation of an even more experienced magistrate judge with an outstanding history of deciding these issues correctly. Although certainly fairly debatable, this Court finds just enough indicia to support a reasonable suspicion of illegal activity under Eighth Circuit precedent, concluding that Schmitz's suspicions were not merely "inchoate rather than reasonable."

"Under the Fourth Amendment, an officer may not extend a traffic stop longer than 'the time needed to handle the matter for which the stop was made' unless he has reasonable suspicion of criminal activity." United States v. Pacheco, 996 F.3d 508, 511 (8th Cir. 2021) (quoting Rodriguez, 575 U.S. at 350). "Reasonable suspicion requires an officer to have a 'particularized

[8] Schmitz's training and experience in drug interdiction is extensive. He started working for the South Dakota Highway Patrol in 2009. Doc. 54 at 11. In 2011 he became a handler for a drug detection dog, a position he held until 2019. Id. at 13. As a canine handler, Schmitz attended a six-week initial training camp. Id. at 11. To maintain his certification, he completed 16 hours of training every two weeks. Id. at 13. Schmitz has also attended trainings on his own accord. He has attended three week-long conferences put on by the National Interdiction Conference, a weeklong DIAP class for interdiction of large trucks, and two 40-week courses known as "Desert Snow." Id. at 12. And at the time of the underlying traffic stop, Schmitz oversaw the "western half of the state's police service dog program." Id. at 13.

and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" Id. (quoting United States v. Jones, 606 F.3d 964, 965–66 (8th Cir. 2010)); see also United States v. Maltais, 403 F.3d 550, 555 (8th Cir. 2005) ("In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." (internal quotation marks omitted) (quoting United States v. Ortiz–Monroy, 332 F.3d 525, 529 (8th Cir. 2003))). Reasonable suspicion is a low bar. "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Pacheco, 996 F.3d at 511–12 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). Like probable cause, reasonable suspicion, "is not 'readily or even usefully, reduced to a neat set of legal rules.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).[9]

Still, reasonable suspicion requires more than "a mere hunch," Pacheco, 996 F.3d at 511, or an "inchoate and unparticularized suspicion," United States v. Lebrun, 261 F.3d 731, 733 (8th

[9] In wrestling with the elusive standard that is reasonable suspicion, the Supreme Court of the United States provided some helpful guidance:

> First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

United States v. Cortez, 449 U.S. 411, 418 (1981); see also Sokolow, 490 U.S. at 7–8 (quoting Cortez to reverse the Ninth Circuit's attempt to "refine and elaborate the requirements of 'reasonable suspicion'").

Cir. 2001) (cleaned up and citation omitted). In deciding whether an officer's suspicions are objectively reasonable, this Court must consider the totality of circumstances, keeping in mind that seemingly "innocent facts, when considered together, can give rise to reasonable suspicion." Id. at 733.

The Eighth Circuit's case law acknowledges the validity of the factors that Schmitz deemed to have provided him reasonable suspicion that criminal activity was afoot to prolong the stop to await arrival of a drug detection dog. First, Schmitz testified that the vehicle had a "lived-in look," which suggested to him that Walsh and Pitts were "traveling hard" and attempting to make as few stops as possible. Schmitz testified that the passenger compartment was full of food, blankets, clothes, luggage, and trash. The Eighth Circuit has repeatedly "found reasonable suspicion to extend a traffic stop in part because of a vehicle's lived-in look." Pacheco, 996 F.3d at 512; see also United States v. Bowman, 660 F.3d 338, 345 (8th Cir. 2011) (listing the car's "lived-in look" among the observations giving rise to reasonable suspicion); United States v. Mayo, 627 F.3d 709, 714 (8th Cir. 2010) (finding *probable cause* to search a minivan in part because of van's "lived-in look"); Lebrun, 261 F.3d at 733 (finding reasonable suspicion based in part on officer's observation of drink containers, food wrappers, cell phone, pillows, and blankets and the inference that the occupants were traveling without making any stops).

The multitude of items Schmitz observed in the passenger compartment also distinguishes this case from United States v. Beck, 140 F.3d 1129, 1137 (8th Cir. 1998). In Beck, the Eighth Circuit held that the mere presence of "fast-food wrappers"—something "entirely consistent with innocent travel"—"cannot reasonably be said to give rise to suspicion of criminal activity" absent some "contradictory information," because, as the Beck court recognized, fast-food wrappers along are "ubiquitous" in interstate travel. See 140 F.3d at 1138 (quoting Karnes v. Skrutski, 62

F.3d 485, 496 (3d Cir. 1995)). Schmitz acknowledged that food containers in vehicles are common for motorists innocently engaged in interstate travel. Doc. 54 at 55. What distinguishes Beck is that the officer "offered no basis for his supposition" that fast-food trash distinguishes drug traffickers from innocent travelers. Beck, 140 F.3d at 1138–39. Here, Schmitz testified about other signs of "hard travel" and why drug traffickers engage in hard travel. See Doc. 54 at 27–28.

Second, Walsh appeared to Schmitz to be unusually nervous through the whole traffic stop. Excessive or unusual nervousness can support reasonable suspicion to extend a traffic stop. Pacheco, 996 F.3d at 512–13 (explaining that Beck "does not foreclose relying on a defendant's unusual or extreme nervousness to find reasonable suspicion"). "[E]xtreme and unusually nervous behavior observed in conjunction with only one or two other facts can generate reasonable suspicion that criminal activity is afoot." United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001). The Eighth Circuit has "previously found reasonable suspicion to extend a traffic stop where a person exhibited 'unusual nervousness even after [the officer] advised [him] that he was issuing only a warning.'" Pacheco, 996 F.3d at 512 (alterations in original) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)); see also Lebrun, 261 F.3d at 733–34. A visibly elevated heart rate can contribute to a finding of unusual nervousness. See United States v. Riley, 684 F.3d 758, 763 (8th Cir. 2012) (finding defendant "exhibited undue nervousness in the form of a visibly elevated heart rate, shallow breathing, and repetitive gesticulations"). Upon Schmitz's initial encounter with Walsh, he observed that she had "darty eyes" and shaky hands and appeared "overly nervous compared to most traffic stops." Doc. 54 at 30. Even after learning that she would be receiving a warning instead of a ticket, Walsh continued to display signs of excessive nervousness. Id. at 34–35. At the suppression hearing, Schmitz explained how Walsh had an

elevated heart rate and that he could see her neck arteries pulsing. Id. at 35. He also testified that Walsh talked rapidly and tried to control the conversation by changing the subject. Id. at 34.

Third, Schmitz found Walsh's travel plans suspicious and unusual when compared with the general motoring public. "[R]easonable suspicion [can] derive from unusual or suspicious travel plans." Riley, 684 F.3d at 764 (cleaned up and citation omitted); see Beck, 140 F.3d at 1139 (explaining that "unusual or suspicious travel plans may give rise to reasonable suspicion") (citing United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995) (finding reasonable suspicion based on suspicious travel plans, nervousness, and inconsistent answers)). "To make such a long trip—only to stay at the destination for such a short amount of time—is also consistent with the behavior of a drug courier." United States v. Batara-Molina, 60 F.4th 1251, 1257 (10th Cir. 2023) (citations omitted). Although Walsh did not struggle to answer Schmitz's questions about destination or purpose, her stated travel plans cast "doubt on the nature and legitimacy" of her trip. See generally Jones, 269 F.3d at 924 (providing that inconsistent answers to questions about destination and purpose may "cast[] suspicion and doubt on the nature and legitimacy of the activity being investigated"). The stop occurred in the afternoon of Thursday, November 25, 2022, Thanksgiving Day. Walsh told Schmitz that they were traveling from California's bay area to Sioux Falls. Ex. 1 at 00:05:25. According to Walsh, this trip takes about 24 hours of drive time. And given the location of the stop, they still had a couple more hours to drive, meaning they would not get to Sioux Falls until Thursday night. Walsh also told Schmitz that she had to be back in California before Monday because her kid or kids, who stayed home with their father, had school.

As Schmitz noted while testifying, that left very little time to stay. To make it back by Monday, they would have to leave for California by Saturday evening at the very latest, but that assumes 24 hours of straight driving, an unlikely scenario given that Walsh had been the sole driver

up to that point and found the trip "very tiring." Ex. 1 at 00:05:50–00:06:00. If they took the two hotel stops that they took on the drive to Sioux Falls,[10] their stay in South Dakota would be a single day (Friday). See Batara-Molina, 60 F.4th at 1257–58 (concluding that defendant's two-day stay in Sioux Falls after driving from California was suspiciously short and supported a finding of reasonable suspicion). Schmitz found the short stay suspicious because it is unusual for individuals to drive across the country to visit family only to turn around and drive all the way back a day later. Doc. 54 at 33–34. Additionally, Schmitz found it unusual that a mother would leave her family over a long holiday weekend to drive across the country. He testified that "it was another indicator that normally I don't see." Id. at 79.

Fourth, the vehicle was registered to an absent third party. Reasonable suspicion may be based, at least in part, on an absent third-party vehicle owner/registrant. Fuse, 391 F.3d at 929 (recognizing that a car not belonging to either of the vehicle's occupants was a fact contributing to reasonable suspicion); United States v. Gilroy St. Patrick Stewart, 92 F.4th 461, 469–70 (3d Cir. 2024) (holding that the use of car registered to an absent third party is a factor contributing to reasonable suspicion); see Batara-Molina, 60 F.4th at 1257 (noting that use of a third-party car was properly considered suspicious). Schmitz testified that the use a third-party vehicle for a cross-country trip was another indicator of criminal activity. Doc. 54 at 77, 82. Moreover, when asked who owned the car, neither Walsh nor Pitts could or would provide a name. Ex. 1 at 00:05:47; see Doc. 54 at 30. To Schmitz, this was a "big red flag." Doc. 54 at 77 (testifying that "it's very, very rare that I stop anybody that doesn't know whose vehicle it is").

---

[10] In fairness, Walsh does tell Schmitz that they were late and intended to arrive before Thanksgiving but had to take two hotel stops for inclement weather. Ex. 1 at 00:05:59–00:06:30. These statements seem to suggest that the two had left California on Tuesday and intended to drive straight through taking as few as stops as possible, which would also appear to bolster Schmitz's suspicion of "hard travel."

Finally, Walsh's physical appearance reflected persistent use of hard drugs. Signs or symptoms of drug use, such as rotting teeth, can be a fact within the totality of circumstances giving rise to reasonable suspicion. See United States v. Betts, 88 F.4th 769, 774–75 (8th Cir. 2023). Although overly worn and decaying teeth could also just be an innocent dental problem, this Court must "view an officer's observations through their own eyes, since they are 'trained to cull significance from behavior that would appear innocent to the untrained observer.'" Id. at 775 (quoting United States v. Poitier, 818 F.2d 679, 683 (8th Cir. 1987)). Thus, Walsh's personal appearance contributes, however slightly, to the existence of reasonable suspicion.

Reasonable suspicion "only requires that police articulate some minimal, objective justification" for a stop. Fuse, 391 F.3d at 929; see also Sokolow, 490 U.S. at 7. In some cases, "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Sokolow, 490 U.S. at 9 (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curiam)). Each fact may on its own be entirely innocent. Id.; Fuse, 391 F.3d at 929. But "an officer's 'reasonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis.'" Gilroy St. Patrick Stewart, 92 F.4th at 468 (quoting United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018)). "[I]n some circumstances the sum may amount to more than its parts." Riley, 684 F.3d at 764 (alteration in original) (quoting Jones, 269 F.3d at 929). Therefore, based on the totality of the specific and articulable facts Schmitz observed, along with the "rational inferences [drawn] from those facts," Jones, 269 F.3d at 927, this Court finds that Schmitz had reasonable suspicion to extend the traffic stop.

Furthermore, "there is no *per se* time limit on all traffic stops." Riley, 684 F.3d at 765 (quoting United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008)). "[U]nder the proper circumstances, [the Eighth Circuit] ha[s] considered delays for dog-sniffs far in excess of 90

minutes reasonable." Id. (first alteration in original) (quoting United States v. Donnelly, 475 F.3d 946, 953–54 (8th Cir. 2007)); see, e.g., Maltais, 403 F.3d at 557–58 (finding three-hour delay reasonable when stop occurred in a remote location and officers "acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available"). Whether the delay for a dog sniff was reasonable depends on whether the officer "acted diligently to obtain the dog" and the delay was not within his or her control. See United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (concluding that 80-minute detention awaiting drug dog was reasonable because officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog").

Here, the length of delay was largely out of Schmitz's control. After both Walsh and Pitts denied permission to search the SUV, Schmitz promptly called for the nearest drug dog, which was 39 miles away. Ex. 1 at 00:17:34; Doc. 54 at 41–43. While en route to the traffic stop, Moran's vehicle suffered a mechanical failure, and he had to call the Lyman County Sheriff's Office to drive him the rest of the way. Doc. 54 at 43. This stop occurred on Thanksgiving Day and in rural central South Dakota, so the number and proximity of available drug detection dogs was likely lower than it otherwise may have been. In short, none of the factors contributing to the approximately one hour wait for the drug dog to arrive were avoidable or the result of a lack of diligence from Schmitz or Moran.

Because this Court determines that Schmitz had reasonable suspicion to extend the traffic stop, this Court need not decide whether Walsh's statements to Officers Dowling and Parish were fruit of a poisonous tree.

## IV. Conclusion

For the reasons addressed above, it is

ORDERED that the Government's Objections to Report and Recommendation for Disposition of Motion to Suppress, Doc. 68, are sustained, and this Court declines to adopt the Report and Recommendation for Disposition of Motion to Suppress, Doc. 67. It is further

ORDERED that Defendant's Motion to Suppress, Doc. 33, is denied.

DATED this 10th day of May, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE